**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| R. J. CORMAN RAILROAD COMPANY/LUZERNE AND SUSQUEHANNA LINE, LLC,<br><br>Plaintiff,<br>v.<br><br>LUZERNE COUNTY; LUZERNE COUNTY COUNCIL; JIMMY SABATINO, BRITTANY STEPHENSON, PATTY KRUSHNOWSKI, JOHN LOMBARDO, JOANNA BRYN SMITH, HARRY HAAS, DAWN SIMMONS, LEE ANN MCDERMOTT, CHRIS BELLES, DENISE WILLIAMS, and STEVE COSLETT, in their official capacities as members of the Luzerne County Council; REDEVELOPMENT AUTHORITY OF THE COUNTY OF LUZERNE; LUZERNE COUNTY RAIL CORPORATION; JAMES BROGNA, THOMAS BENZ, KYLE ROZITSKI, THOMAS SOKOLA, and JEFF WEISENBERGER, in their official capacities as members of the Blue Ribbon Panel; READING BLUE MOUNTAIN & NORTHERN RAILROAD COMPANY, and WILKES-BARRE TERMINAL RAILWAY, LLC<br><br>Defendants. | Civil Action No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, TO VOID ACTIONS IN VIOLATION OF THE PENNSYLVANIA SUNSHINE ACT, AND TO QUIET TITLE**

Plaintiff, R. J. Corman Railroad Company/Luzerne and Susquehanna Line, LLC ("R. J. Corman"), by and through its undersigned counsel, files this Complaint against Luzerne County (the "County"), the Luzerne County Council (the "Council"), Jimmy Sabatino, Brittany Stephenson, Patty Krushnowski, John Lombardo, Joanna Bryn Smith, Harry Haas, Dawn Simmons, Lee Ann McDermott, Chris Belles, Denise Williams, and Steve Coslett, in their official capacities as members of the Council (the "Council Members"), the Redevelopment Authority of the County of Luzerne ("LCRA"), the Luzerne County Rail Corporation ("LCRC"), James Brogna, Thomas Benz, Kyle Rozitski, Thomas Sokola, and Jeff Weisenberger, in their official capacities as members of the Blue Ribbon Panel (the "Blue Ribbon Panel Members"), Reading Blue Mountain & Northern Railroad Company and Wilkes-Barre Terminal Railway, LLC (collectively, "RBMN"). The County, Council, the Council Members, LCRA, LCRC, and the Blue Ribbon Panel Members, are referred to collectively as the "Public Defendants." In support, R. J. Corman avers as follows:

**NATURE OF THE ACTION**

1. This action concerns the Public Defendants' imminent sale of an active, federally regulated freight rail line in northeastern Pennsylvania known as the

Luzerne & Susquehanna Line (the "LS"), together with the freight rail operating rights associated with it. The LS comprises approximately sixty miles of right-of-way, of which approximately twenty-seven miles are in active freight service.

2. Since 1994, LCRA has held title to the LS (excluding the Grimes Industrial Track discussed herein) and LCRC has held the associated freight rail operating rights.

3. For more than twenty-five years, a private common carrier has operated the LS under a perpetual lease and operating agreement with LCRC.

4. Since December 2020, that common carrier has been R. J. Corman, which provides uninterrupted freight service to several shippers on the LS.

5. Following a public request for proposal ("RFP") process, LCRA and LCRC voted to sell the LS and the associated operating rights to the highest bidder, R. J. Corman; however, the County vetoed the sale, and LCRA and LCRC subsequently voted to sell the LS and the associated operating rights to RBMN, despite the fact that RBMN bid $1.2M less than R. J. Corman.

6. The outcome R. J. Corman challenges here was not the product of a neutral public sale. It was the culmination of a collusive, fraudulent, anti-transparent, and unlawful effort by the County to force a sale of the LS and deliver it to RBMN.

7. Every entity involved in the RFP answered to the County.

8. The Council appoints all five members of the LCRA board, and the County and/or Council appointed a five-member committee, the so-called "Blue Ribbon Panel," whose members had no experience in railroad transportation and no representation of shipper interests, to evaluate and award the RFP to the County and Council's pre-chosen respondent RBMN.

9. The County and Council's effort to force the sale of the LS to RBMN began in May 2025, when the Council authorized litigation against LCRA and LCRC.

10. In July 2025, the County initiated the action in the Court of Common Pleas of Luzerne County (the "County Action"), seeking approximately $3.28M on loans it had made *nearly three decades* earlier and had never once demanded repayment.

11. The County and its Council abused the judicial process by filing the frivolous County Action, not for the stated purpose to collect loans that were in "anticipatory default," but for the true purpose of forcing the sale of the LS to RBMN.

12. Two months after the County Action was filed, RBMN's CEO Andy Mueller wrote to LCRA offering $10M to purchase the LS and stating that RBMN was willing to close before R. J. Corman's Operating Agreement expired.

13. The County Manager forwarded the offer to Council, described it as a "direct consequence of our decision to initiate the [County Action]," and warned that LCRA board members who rejected the County's demand to sell the LS to RBMN could face removal for alleged "violations of their fiduciary duties."

14. Council member John Lombardo told newspaper reporters that the LCRA board members were "silly" for not selling the LS to RBMN in a private sale rather than engaging in an open and transparent process to maximize the public benefit received from the sale of the public asset.

15. In early 2026, the County, LCRA, and LCRC settled the County Action. Upon information and belief, the settlement agreement ("Settlement Agreement") required LCRA and LCRC to issue an RFP for the sale of the LS and the associated operating rights and made any sale subject to the County's approval.[1]

16. Upon information and belief, the Settlement Agreement further provides that if no sale closes by October 9, 2026, a deadline matching the timeframe RBMN had publicly announced for its acquisition of the LS, the County will take

---

[1] Although the Settlement Agreement is a public record under the Pennsylvania Right-to-Know Law, the County's attorneys have not responded to R. J. Corman's counsel's request for a copy of the Settlement Agreement, and LCRA counsel would not disclose it to R. J. Corman counsel because the County's counsel told him it was confidential, although the County apparently leaked a copy of the Settlement Agreement to a newspaper reporter.

possession of the LS and per the terms of the RFP transfer the associated operating rights to RBMN, which would result in an ouster of R. J. Corman operating the LS.

17. On July 29, 2026, the County issued the RFP on behalf of LCRA and LCRC. Upon information and belief, the sale it solicited purports to include the operating rights to the Grimes Industrial Track, which track R. J. Corman, not LCRA, owns.

18. Nevertheless, R. J. Corman submitted the highest bid of $8.2M, which was $1.2M more than the $7M in cash offered by RBMN.

19. On September 11, 2026, the Blue Ribbon Panel Members, deliberating and voting outside any meeting open to the public, recommended to award the RFP to RBMN.

20. Upon information and belief, the Blue Ribbon Panel Members did not use fair, consistent, and objective standards to evaluate the RFP, but clandestinely chose the County's pre-chosen respondent, RBMN.

21. On September 15, 2026, at an advertised public meeting and after public comment and deliberation, LCRA awarded the sale to R. J. Corman, and LCRC awarded the associated operating rights to R. J. Corman.

22. After losing, RBMN publicly increased its price to $10M. It did so weeks after the submission deadline, after the proposals had been opened, and after it knew both R. J. Corman's price and the result.

23. One week after the award, the Council adopted a resolution objecting to the sale to R. J. Corman (the "Veto Resolution"). It did so without public deliberation in violation of the Pennsylvania Sunshine Act and without explaining how rejecting the highest offer, which would have repaid the County's loans in full, served the public interest.

24. Thereafter, on September 30, 2026, at a special meeting, LCRA and LCRC reversed their awards and voted to sell the LS and the associated operating rights to RBMN.

25. The Council's veto, and the County's plan to take possession of the LS and transfer its freight operating rights to RBMN without authorization from the Surface Transportation Board ("STB"), are preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10501(b).

26. R. J. Corman is the common carrier on the LS, and only the STB may authorize it to be displaced.

27. The award to RBMN also violates Pennsylvania competitive bidding law, and the Council members and the Blue Ribbon Panel members violated the Pennsylvania Sunshine Act.

28. The RFP also purports to include and convey the operating rights to the Grimes Industrial Track, which track R. J. Corman, not LCRA, owns.

29. R. J. Corman has made substantial investments in major repairs above its responsibilities in the Operating Agreement in reliance on the perpetual lease.

30. Closing is scheduled to occur on or before October 9, 2026. Unless it is enjoined, R. J. Corman will be ousted from an active common carrier line, its shippers' service will be put at risk, and title to property it owns will be clouded.

**THE PARTIES**

31. Plaintiff, R. J. Corman, is a limited liability company organized under the laws of Pennsylvania, with its principal place of business at 1 Rutledge St, Pittston, PA, 18640-3109. For federal diversity purposes R. J. Corman is a citizen of the Commonwealth of Kentucky, as its ultimate members are adult individuals residing there.

32. The County is a county and subdivision of the Commonwealth of Pennsylvania, governed by the Luzerne County Home Rule Charter, with offices at the Luzerne County Courthouse, 200 North River Street, Wilkes-Barre, Pennsylvania 18711.

33. The Council is the eleven-member legislative body of the County, established under the Home Rule Charter, with offices at 200 North River Street, Wilkes-Barre, Pennsylvania 18711.

34. The Council appoints the five members of the LCRA board.

35. The LCRA is a public body organized under the Urban Redevelopment Law, with its principal office at 16 Luzerne Avenue, Suite 200, West Pittston, Pennsylvania 18643.

36. The LCRA holds title to the LS (excluding the Grimes Industrial Track discussed herein).

37. The LCRC is a Pennsylvania nonprofit corporation formed in 1994 to serve as the operating entity of the LS with its principal office at 16 Luzerne Avenue, #210, West Pittston, Pennsylvania 18643.

38. The LCRC holds the operating rights associated with the LS and is the lessor under the lease and Operating Agreement with R. J. Corman.

39. Upon information and belief, the Blue Ribbon Panel Members are members of a committee created and authorized by the County and/or Council to evaluate the proposals and recommend a purchaser for the LS and the associated operating rights.

40. RBMN is a Pennsylvania corporation with its principal place of business at 1 Railroad Boulevard, P.O. Box 218, Port Clinton, Pennsylvania 19549. RBMN is named as a defendant because it is the purported winning bidder under the award challenged here and because complete relief cannot be afforded in its absence.

41. Upon information and belief, Wilkes-Barre Terminal Railway, LLC is a Pennsylvania LLC and a subsidiary of RBMN, and acts herein solely in conjunction with RBMN.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Count I arises under the laws and Constitution of the United States, namely the ICCTA, 49 U.S.C. § 10501(b), and the Supremacy Clause, U.S. Const. art. VI, cl. 2. A party subject to state or local action preempted by federal law may seek declaratory and injunctive relief against that action in federal court. *Union Pacific Railroad Co. v. Chicago Transit Authority*, 647 F.3d 675 (7th Cir. 2011).

43. Separately and independently, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). R. J. Corman is a limited liability company whose ultimate members are adult individuals residing in Kentucky. R. J. Corman is therefore a citizen of Kentucky, and not of Pennsylvania.

44. Each Defendant is a citizen of Pennsylvania.

45. The amount in controversy exceeds $75,000, exclusive of interest and costs. The object of this action is the LS and associated operating rights for which R. J. Corman offered $8.2M, and which LRCA and LCRC have awarded to be sold to RBMN for $7M.

46. This Court has supplemental jurisdiction over R. J. Corman's state law claims under 28 U.S.C. § 1367(a) because they arise from the same nucleus of operative fact as its federal claim and form part of the same case or controversy.

47. This Court may grant declaratory relief and further necessary or proper relief under 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

48. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). All Defendants reside in Pennsylvania, and at least one resides in this District. A substantial part of the events giving rise to the claims occurred in Luzerne County. The LS and Grimes Industrial Track are located in Luzerne County.

## FACTUAL BACKGROUND

### A. The LS and Its Operation by a Common Carrier

49. On September 17, 1993, the Pocono Northeast Railway Company ceased providing rail service to its customers in northeastern Pennsylvania. From September 29, 1993 to May 24, 1994, service was provided by a common carrier under Directed Service Order No. 1513 issued by the Interstate Commerce Commission ("ICC").

50. In March 1994, LCRA began negotiations to acquire the line. LCRC was formed at the same time as a nonprofit entity to serve as the operating entity.

51. In July 1994, LCRC selected the Luzerne and Susquehanna Railway Company as the long term operator. The ICC authorized that company to provide rail service on August 25, 1994, and it began service the next day.

52. LCRA acquired approximately 55.55 miles of rail line and associated facilities and land using a $3.1M PennDOT Rail Acquisition Grant and loans from the County secured by mortgages (the "County Loans").

53. The Operating Agreement was executed in 2002 and has been amended and extended numerous times, and R. J. Corman continues to provide rail freight service to shippers in Luzerne County on behalf of LCRC pursuant to the terms of the Operating Agreement.

54. In December 2020, R. J. Corman acquired the Luzerne and Susquehanna Railway Company and its assets, including its common carrier authority over the LS.

55. Since then, R. J. Corman has provided freight rail service on the LS under the Operating Agreement.

56. The LS has thus been operated by a private common carrier under a lease and operating agreement with LCRC for more than twenty-five years.

57. Upon information and belief, the County has known of the Operating Agreement since 2002. It never objected to the Operating Agreement or any of its amendments or extensions.

58. Before 2025, the County never required LCRC to obtain the County's permission to execute, amend, or extend it.

59. LCRA's rail holdings comprise approximately sixty miles of right-of-way, of which approximately twenty-seven miles are in active operation, together with Ashley Yard, Avoca Yard, and approximately 140 public and private crossings.

60. R. J. Corman is a common carrier by rail engaged in interstate commerce. Freight moving on the LS originates or terminates at points outside Pennsylvania and interchanges with other common carriers.

61. As the common carrier on the LS, R. J. Corman is obligated to provide freight rail service and it may not cease providing that service unless the STB authorizes it to do so. 49 U.S.C. § 10903.

62. That obligation does not end when a lease or operating agreement expires. It continues until the STB authorizes discontinuance.

63. R. J. Corman has made substantial investments in the infrastructure of the LS and continues to provide uninterrupted freight rail service to the shippers on the LS.

64. Neither LCRA, LCRC, nor the County has ever notified R. J. Corman of any material default under the Operating Agreement.

**B. The Grimes Industrial Track**

65. R. J. Corman owns the Grimes Industrial Track located in Luzerne County.

66. Title is vested in R. J. Corman and recorded in the Office of the Recorder of Deeds of Luzerne County as Instrument Number 202062092 and found in Book 3020 at Page 263531.

67. The Grimes Industrial Track is an industrial track, separate from the LS, which R. J. Corman uses to connect shippers to the LS.

68. R. J. Corman has exclusive ownership of the Grimes Industrial Track and is in actual, open, notorious, and exclusive possession of it.

69. The Grimes Industrial Track handles approximately thirty-seven percent of all carload traffic on the LS.

70. LCRA does not own the Grimes Industrial Track, and LCRC does not hold operating rights over it.

71. Upon information and belief, the proposed sale to RBMN purports to convey the Grimes Industrial Track and/or operating rights over it.

72. Upon information and belief, the County asserts that the Grimes Industrial Track is subject to its mortgage liens and to its claimed right to take possession of certain rail property.

73. Before the award of the RFP, RBMN asked the County to clarify the ownership of the Grimes Industrial Track, as RBMN believed it was up for sale but did not believe it was owned by LCRA, and the County either failed to respond to such inquiry or privately responded to such inquiry in violation of the express terms of the RFP.

74. Upon information and belief, the County knows the Grimes Industrial Track is not owned by LCRA, but nonetheless pressured LCRA to move forward with the sale of the LS despite uncertain title because marketable title is trivial to the County's desire to sell the LS to RBMN on RBMN's desired time frame.

**C. RBMN's Campaign for the LS and the County Action**

75. RBMN has long sought to acquire the LS to eliminate R. J. Corman as a competitor in northeastern Pennsylvania.

76. In May 2025, the Council voted to authorize litigation against LCRA and LCRC.

77. In a letter to LCRA dated May 15, 2025, twenty-nine years after the issuance of the County Loans, the County stated that it sought to take possession of LCRC, sell the LS, and use the proceeds to repay the County Loans.

78. On July 23, 2025, the County filed the County Action against LCRA and LCRC.

79. The County Action purported to seek approximately $3.28M on the County Loans and the appointment of a receiver over certain rail property.

80. When the County filed suit, no balance on the County Loans was due.

81. In the roughly twenty-nine years since the loans were made, the County had never demanded repayment of the loans until shortly before initiating the County Action.

82. LCRA and LCRC answered the County Action with New Matter. They pleaded that they were not in default and that the County's true purpose was to force a sale of the LS to a private operator.

83. On September 29, 2025, about two months after the County Action was filed, RBMN's CEO, Andy M. Muller, Jr., wrote to LCRA. He offered to buy all of LCRA's property interests in a private sale for $10M and stated that RBMN was willing to close before the Operating Agreement expired.

84. RBMN's offer was thus framed from the outset around the same objective the County was pursuing, which was displacing R. J. Corman before the Operating Agreement ran its course.

85. The County Manager, Romilda Crocamo, credited the offer as a "direct consequence of our decision to initiate the [County Action]."

86. In the same email, she warned that LCRA board members who rejected the County's position "would be breaching their fiduciary obligation, which could result in their removal."

87. Because Council appoints the LCRA board, that warning carried the threat of removal by the very body that later reversed its initial award to R. J. Corman in favor of RBMN.

88. In January 2026, RBMN publicly announced its goal of completing its acquisition of the LS during 2026.

**D. The Settlement Agreement**

89. In early 2026, the County, LCRA, and LCRC entered into the Settlement Agreement resolving the County Action.

90. Upon information and belief, the Settlement Agreement required LCRA and LCRC to issue a request for proposals for the sale of LCRA's rail holdings and LCRC's associated freight rail operating rights. It also made any sale subject to the County's approval.

91. Upon information and belief, the Settlement Agreement further provides that if a sale does not close by October 9, 2026, the County will immediately take possession of all of the LS and all of LCRC's operating rights.

92. Through the Settlement Agreement, the County gave itself a veto over the sale.

93. Through its appointment and removal power, it already held influence over the LCRA board.

94. It thus positioned itself to control both the process and the outcome.

**E. The Request for Proposals**

95. On July 29, 2026, the County issued the RFP on behalf of LCRA and LCRC for the sale of LCRA's rail line holdings and all of LCRC's operating rights.

96. The County issued the RFP without having completed a full inspection of the rail line assets, including, upon information and belief, those associated with the Grimes Industrial Track.

97. The RFP represented that the sellers were soliciting interest through an open and public process, that data would be made equally available to all proposers, and that questions and answers would be published.

98. The RFP listed the sellers' objectives in this order:

(1) the line must continue to be used for the transport of freight;

(2) continuing and uninterrupted rail service to all current customers;

(3) maintaining, preserving, and improving the line's assets and infrastructure;

(4) increasing economic activity in the County;

(5) enhancing customer service and expanding services where feasible;

(6) expansion for passenger service when feasible; and

(7) returning the assets to responsible private-sector ownership.

99. Proposals were due on August 28, 2026 (the "Submission Deadline").

100. Each proposal was required to state its offer price "in clear and unconditional terms" and to identify separately any funds proposed to be earmarked, reserved, or escrowed for maintenance or repairs.

101. The RFP provided that the award would issue within fifteen days of the Submission Deadline and that closing must occur by October 9, 2026.

**F. The Proposals**

102. R. J. Corman, RBMN, and Juniata & Aughwick Railroad LLC ("J&A") each submitted a proposal.

103. R. J. Corman offered $8.2M in cash at closing. That amount was sufficient to repay the County Loans in full.

104. RBMN offered $7M in cash at closing, plus a $3M package for track rehabilitation that would not be paid to the sellers.

105. J&A proposed to lease the line and share revenue with LCRA.

106. Every common carrier is obligated to maintain its line. Money a purchaser plans to spend on its own property after closing is not consideration paid to the seller. Under the RFP's terms, it could not be counted as part of the offer price.

107. On the terms the RFP required, R. J. Corman's proposal was the highest.

**G. The Blue Ribbon Panel's Recommendation**

108. The Blue Ribbon Panel was created and authorized by the County and/or the Council purportedly to evaluate the proposals and to recommend a purchase, but actually to recommend the County's pre-selected respondent RBMN.

109. On or about September 11, 2026, the Blue Ribbon Panel recommended the proposal submitted by RBMN.

110. Upon information and belief, the Blue Ribbon Panel members deliberated on the proposals and voted on its recommendation outside of any meeting open to the public.

111. They gave no public notice of any meeting, provided no opportunity for public comment, and kept no public minutes.

### H. LCRA and LCRC Award the Sale to R. J. Corman

112. On September 15, 2026, at an advertised public meeting and following public comment and public deliberation, LCRA voted to award the RFP to R. J. Corman.

113. On the same date, LCRC voted to award the LS operating rights to R. J. Corman.

114. A board member of LCRA and LCRA stated that he chose to award the RFP to R. J. Corman because R. J. Corman was the highest bidder and because the sale maximized the amount of money the Public Defendants would receive for the sale of the public asset.

115. LCRA and LCRC made these awards because R. J. Corman was the highest bidder, its offer maximized the proceeds of the sale, and it would ensure continued, uninterrupted freight service.

### I. RBMN's Post Deadline Price Increase

116. After the September 15, 2026 award, RBMN's CEO publicly announced that RBMN would pay $10M to purchase the LS.

117. RBMN made this announcement weeks after the Submission Deadline, after the proposals had been opened, and after RBMN knew both R. J. Corman's price and the outcome of the award.

118. RBMN's new offer was not a response to any request for best and final offers.

119. R. J. Corman was never invited to submit a revised offer or a best and final offer.

120. RBMN also posted online urging its supporters to attend the September 22, 2026 Council meeting to advocate for RBMN.

121. Upon information and belief, RBMN communicated with County officials and Council members about the sale, its revised price, and the September 22 meeting before that meeting took place.

**J. Council Vetoes the Award to R. J. Corman**

122. At its September 22, 2026 meeting, the Council adopted the Veto Resolution, objecting to any sale to R. J. Corman.

123. The Council adopted the Veto Resolution without meaningful public deliberation. Council has never explained how rejecting the highest offer, which would have repaid the County Loans in full, served the public interest.

124. Based on lack of public deliberation or rational explanation for selecting a low bidder, it is believed and therefore averred that a quorum of Council deliberated on and decided the outcome of the September 22 vote before the public

meeting, outside of any meeting open to the public, including through private meetings or communications.

125. The Veto Resolution served no purpose other than to prevent the sale to R. J. Corman and to pressure LCRA and LCRA to sell the LS and associated operating rights to RBMN.

126. The Council was not motivated by any of the RFP's stated objectives, by repayment of the County Loans, or by the price of the sale, but solely by its desire to sell the LS to RBMN.

127. The Council's veto of the sale to the highest bidder, in a manner that would have allowed LCRA and LCRC to repay the County's loans in full, confirms that the County Lawsuit was an abuse of process motivated by a desire to sell the LS to a pre-selected respondent, RBMN.

**K. LCRA and LCRC Reverse The Award**

128. On September 30, 2026, eight days after the Veto Resolution and at a special public meeting, LCRA voted to award the RFP to RBMN and to sell the LS to RBMN and LCRC voted to sell the associated freight rail operating rights to RBMN for $7M, which is $1.2M less than offered by R. J. Corman, and $3M less than RBMN's president publicly announced he would pay for the LS if he had another opportunity to bid.

129. A minority member of the LCRA and LCRC voted against the award to RBMN because RBMN's bid was lower than R. J. Corman's, would result in less funds to the Public Defendants, and he believed that LCRA did not own the Grimes Industrial Track and that the award of R. J. Corman's property to a competitor railroad would result in litigation.

130. Members of the LCRA and LCRA ignored public comment from a resident who asked why they would award the RFP to RBMN for $7M after RBMN's CEO publicly announced that he would pay $10M for the LS and why they would not reengage the bidders to submit a highest and best offer as permitted by the terms of the RFP.

131. Upon information and belief, LCRA's and LCRC's board members acted under the threat of removal expressed in the County Manager's publicized statements.

132. On October 1, 2026, at a special public meeting, County Council approved the sale of the LS and associated operating rights to RBMN.

**L. The Closing**

133. Upon information and belief, the closing of the sale of the LS and the associated freight rail operating rights to RBMN is scheduled to occur on or before October 9, 2026.

134. Upon information and belief, the County intends to enter upon and take possession of the LS on or before October 9, 2026, and to transfer the freight rail operating rights to RBMN.

135. No Defendant has sought or obtained authority from the STB for RBMN to acquire or operate the LS.

136. No party has sought or obtained authority from the STB to discontinue R. J. Corman's common carrier service on the LS.

137. If the closing and transfer proceed, R. J. Corman will be ousted from an active common carrier line before its Operating Agreement expires and without the STB authorization federal law requires.

138. The ouster will disrupt service to the shippers that depend on the LS.

139. Title to the Grimes Industrial Track will be clouded, impairing R. J. Corman's ability to use, finance, or convey it.

140. The LS is unique property, meaning once it is conveyed and RBMN takes possession, the transfer cannot practically be undone by an award of damages.

## COUNT I

## DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF (28 U.S.C. §§ 2201–2202)

### Plaintiff v. Public Defendants

141. The foregoing paragraphs are incorporated herein by reference.

142. An actual, substantial, and immediate controversy exists between R. J. Corman and the Public Defendants concerning the validity of LCRA and LCRC's initial award to R. J. Corman, the validity of the Veto Resolution, the validity of LCRA's and LCRC's award to RBMN, and whether the County may take possession of the LS and transfer the associated freight rail operating rights to RBMN without first filing a petition with the STB.

### A. ICCTA Preempts the Transfer of the Freight Rail Operating Rights

143. Under ICCTA, the STB's jurisdiction over "transportation by rail carriers" and over "the construction, acquisition, operation, abandonment, or discontinuance" of rail lines "is exclusive," and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

144. State and local regulation of matters directly regulated by the STB, including the operation of rail lines and line acquisitions, like here, are preempted. So is state or local action that would prevent or unreasonably interfere with rail transportation.

145. R. J. Corman is a rail carrier providing common carrier service over the LS. A rail carrier may discontinue service over a line *only* with STB authorization. 49 U.S.C. § 10903. No state or local body may compel a rail carrier to cease common carrier service without such authorization.

146. RBMN's acquisition of the LS and its operation of the line likewise require STB authorization or an exemption. *See* 49 U.S.C. § 10902.

147. A "railroad line" subject to the STB's jurisdiction includes not only the physical track and assets but also the interstate freight transportation authority attached to that property. *Brotherhood of Railroad Signalmen v. Surface Transportation Board*, 638 F.3d 807 (D.C. Cir. 2011); *Maine Department of Transportation—Acquisition & Operation Exemption—Maine Central Railroad Co.*, 8 I.C.C.2d 835 (I.C.C.1991)("The ICC explained it did not consider the transaction to constitute the acquisition of a 'railroad line' triggering mandatory review under section 10901(a)(4) because 'no common carrier rights or obligations [we]re being transferred' as 'both parties agree[d] that [Maine Central] retain [ed] the common carrier obligation and that it could not cease to offer service on the line without ICC permission.'").

148. The freight rail operating rights that the Public Defendants propose to strip from R. J. Corman and convey to RBMN are therefore within the STB's exclusive jurisdiction.

149. The deliberate seizure of an active common carrier line, and its transfer of the freight operating rights to a carrier of its choosing is a direct attempt to manage and govern rail transportation. That conduct is preempted by 49 U.S.C. § 10501(b). It would also unreasonably interfere with interstate rail transportation.

150. To the extent the Settlement Agreement, the Veto Resolution, or the sale to RBMN purports to transfer the freight rail operating rights on the LS, or to displace R. J. Corman as the common carrier on the LS, without STB authorization, it is preempted and unenforceable.

151. To the extent the County purports to take possession of the operating rights on the LS without STB authorization on October 9, 2026, it is preempted and unenforceable.

**B. The Award to RBMN Violates Pennsylvania Competitive Bidding Law**

152. The sale of LCRA's rail holdings was subject to competitive bidding. Independently, having elected to solicit proposals through a public, competitive RFP, the Public Defendants were bound to conduct that process fairly and in accordance with its stated terms.

153. When a public body solicits competitive proposals, it must treat all bidders by a common standard. *Allan Myers, L.P. v. Department of Transportation*, 202 A.3d 205, 211, 215–16 (Pa. Cmwlth. 2019). Competitive bidding requirements

exist to protect the public against favoritism, improvidence, extravagance, fraud, and corruption, and to secure the best value for public property.

154. A public body that has reserved the right to reject bids may not exercise that right through fraud, collusion, bad faith, or arbitrary action. *Weber v. City of Philadelphia*, 262 A.2d 297 (Pa. 1970). A decision to prefer a bidder other than the highest bidder must rest on reasons that are substantial and genuine rather than pretextual, and must follow a full and careful investigation. *J.J.D. Urethane Co. v. Montgomery County*, 694 A.2d 368 (Pa. Cmwlth. 1997).

155. The Public Defendants failed to use a common standard, in at least the following respects:

(a) They rejected the highest and best offer of $8.2M dollars from R. J. Corman, which sale price would have allowed LCRC and LCRA to repay the County's loans in full, and would have resulted in the highest return of funds to the County;

(b) they treated RBMN's $3M of future investment in its own property as a purchase price, contrary to the RFP's requirement that the offer price be stated in clear and unconditional terms and that earmarked maintenance and repair funds be identified separately;

(c) after rejecting the highest offer, they awarded the sale to a lower bidder, RBMN, instead of rebidding or issuing a request for best and final offers to all shortlisted proposers;

(d) they evaluated the proposals through a Blue Ribbon Panel that deliberated and voted in private, without published criteria or any record showing how each proposal was measured against the RFP's stated objectives; and

(e) they solicited and evaluated proposals for an asset package that included the operating rights to the Grimes Industrial Track, which the sellers do not own and cannot convey because R. J. Corman owns the underlying track, so that RBMN's proposal was credited for property RBMN cannot receive.

156. The decision to reject R. J. Corman's offer was not the product of a full and careful investigation. It was predetermined.

157. The Veto Resolution was arbitrary, capricious, and in bad faith. The Council rejected the highest offer, which would have repaid the County Loans in full, even though repaying those loans was the stated purpose of the County Action. The Council stated no substantial or genuine reason for its decision.

158. LCRC cannot convey title and/or operating rights to the Grimes Industrial Track and holds no operating rights over it, yet that track handles roughly

thirty-seven percent of the LS's carload traffic. An award to RBMN therefore cannot ensure continued, uninterrupted service to the shippers that generate more than a third of the line's traffic.

159. Accordingly, the Veto Resolution and the award to RBMN are invalid under Pennsylvania law.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against these Public Defendants and:

(a) Declare that the award of the RFP to RBMN, and any agreement of sale entered into under it, is invalid, void, and of no effect because it violates Pennsylvania competitive bidding law;

(b) Declare that the Veto Resolution was arbitrary, capricious, and made in bad faith, and is therefore void;

(c) Declare that the County's veto of the sale to R. J. Corman, its planned possession of the LS, and any transfer of the freight rail operating rights on the LS to RBMN are preempted by federal law and unenforceable;

(d) Declare that no Public Defendant may transfer the freight rail operating rights on the LS, or displace R. J. Corman as the common carrier on the LS, without authorization from the STB;

(e) Preliminarily and permanently enjoin the Public Defendants, from closing the sale of the LS or the associated operating rights to RBMN; from executing, delivering, or recording any deed or other instrument of conveyance to RBMN; from entering upon or taking possession of the LS; from transferring the freight rail operating rights on the LS; and from interfering with R. J. Corman's common carrier operations on the LS;

(f) Declaring that LCRC and LCRA's initial awards to R. J. Corman are valid and that R. J. Corman is entitled to immediately purchase the LS and associated operating rights for $8.M;

(g) Award R. J. Corman its costs of suit; and

(h) Grant such other and further relief as the Court deems just and proper.

## COUNT II

### VIOLATION OF THE PENNSYLVANIA SUNSHINE ACT (65 PA.C.S. §§ 701–716)

### PLAINTIFF v. DEFENDANTS JIMMY SABATINO, BRITTANY STEPHENSON, PATTY KRUSHNOWSKI, JOHN LOMBARDO, JOANNA BRYN SMITH, HARRY HAAS, DAWN SIMMONS, LEE ANN MCDERMOTT, CHRIS BELLES, DENISE WILLIAMS, AND STEVE COSLET, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE LUZERNE COUNTY COUNCIL; and JAMES BROGNA, THOMAS BENZ, KYLE ROZITSKI, THOMAS SOKOLA, AND JEFF WEISENBERGER, IN THEIR OFFICIAL CAPACITY AS MEMBERS OF THE BLUE RIBBON PANEL

160. The foregoing paragraphs are incorporated herein by reference.

161. The General Assembly has declared that the public has a right to attend all meetings of agencies at which any agency business is discussed or acted upon, and that secrecy in public affairs undermines the faith of the public in government. 65 Pa.C.S. § 702.

162. The Sunshine Act requires "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public . . . " 65 Pa.C.S. § 704.

163. Agencies must give public notice of their meetings. 65 Pa.C.S. § 709.

164. An "agency" includes the body of a political subdivision, "and all committees thereof authorized by the body to take official action or render advice on matters of agency business." 65 Pa.C.S. § 703.

165. The County, Council, and LCRA are agencies.

166. The Blue Ribbon Panel is an agency because it was authorized by the County, Council and/ or LCRA to render advice on matters of agency business, namely the evaluation of the proposals and the selection of a purchaser for the LS.

167. "Official action" includes recommendations made by an agency and any vote taken by an agency on a motion, proposal, or resolution. 65 Pa.C.S. § 703.

168. "Deliberation" means the discussion of agency business held for the purpose of making a decision. 65 Pa.C.S. § 703.

169. The Blue Ribbon Panel Members violated Sections 704 and 709 of the Sunshine Act by deliberating on the proposals and adopting its recommendation of RBMN outside of a meeting open to the public and without public notice.

170. The Council violated Section 704 of the Sunshine Act by deliberating on, and deciding, whether to approve or object to the sale to R. J. Corman outside of a meeting open to the public.

171. Upon information and belief, the September 22, 2026 vote merely formalized a decision made secretly. That the Veto Resolution was adopted without

any public deliberation, after the award to the highest bidder, and without any stated reason, confirms that the deliberations occurred elsewhere.

172. These violations were willful, or were committed with wanton disregard of the Sunshine Act, because they were undertaken to steer the sale of a public asset to a particular bidder while avoiding public scrutiny and accountability.

173. This action is timely under 65 Pa.C.S. § 713.

174. A court may declare invalid official action taken in violation of the Sunshine Act. 65 Pa.C.S. § 713.

175. A court may also render declaratory judgments and enforce the Act by injunction or other appropriate remedy. 65 Pa.C.S. § 715.

176. Plaintiff is directly and adversely affected by these violations. They produced the veto of the award to R. J. Corman and the subsequent award to its competitor.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against these Defendants and:

(a) Declare that the members of the Blue Ribbon Panel violated Sections 704 and 709 of the Sunshine Act by deliberating on and adopting its September 11, 2026 recommendation outside of a meeting open to the public and without public notice;

(b) Declare that the members of Council violated Section 704 of the Sunshine Act by deliberating on and deciding the Veto Resolution outside of a meeting open to the public;

(c) Award Plaintiff its reasonable attorney fees and costs of litigation under 65 Pa.C.S. § 714.1; and

(d) Grant such other and further relief as the Court deems just and proper.

## COUNT III

## AND QUIET TITLE (PA.R.C.P. 1061; 28 U.S.C. § 2201)

## PLAINTIFF V. LCRA, LCRC, THE COUNTY, AND RBMN

177. The foregoing paragraphs are incorporated herein by reference.

178. An action to quiet title may be brought where an action of ejectment will not lie, to determine any right, lien, title, or interest in land. Pa.R.C.P. 1061(b)(2).

179. Because R. J. Corman is in possession of the Grimes Industrial Track, an action of ejectment will not lie.

180. Title is vested in R. J. Corman and recorded in the Office of the Recorder of Deeds of Luzerne County as Instrument Number 202062092 and found in Book 3020 at Page 263531.

181. R. J. Corman holds the freight rail operating rights over the Grimes Industrial Track and is in actual, open, and exclusive possession of it.

182. LCRA has no right, title, or interest in the Grimes Industrial Track, and LCRC holds no operating rights over it.

183. LCRA's and LCRC's purported sale to RBMN of rail holdings and operating rights that include, or are asserted to include, the Grimes Industrial Track and rights over it, casts a cloud on R. J. Corman's title.

184. The County likewise asserts a mortgage lien over, and a right to take possession of, "all rail property," which it contends includes the Grimes Industrial Track.

185. Plaintiff has no adequate remedy at law to remove this cloud on its title.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against these Defendants and:

(a) Declare that title to the Grimes Industrial Track is vested in R .J. Corman, free and clear of any right, title, interest, lien, or claim of LCRA, LCRC, the County, or RBMN;

(b) Declare that LCRA, LCRC, the County, and RBMN have no right, title, or interest in, and no operating rights over, the Grimes Industrial Track;

(c) Enjoin LCRA, LCRC, the County, and RBMN from conveying, encumbering, recording any instrument affecting, taking possession of, or asserting any right, title, interest, or operating right in the Grimes Industrial Track;

(d) Direct these Defendants to execute any release or cancellation necessary to remove any recorded instrument that clouds title to the Grimes Industrial Track;

(e) Award Plaintiff its costs of suit; and

(f) Grant such other and further relief as the Court deems just and proper.

**COHEN SEGLIAS PALLAS**
**GREENHALL & FURMAN PC**

By: ______________________________

**Joshua D. Bonn, Esquire**
**Dylan LaMorte, Esquire**
Email: jbonn@cohenseglias.com
dlamorte@cohenseglias.com
Supreme Court ID Nos. 93967/327970
240 North Third Street, 7th Floor
Harrisburg, PA 17101
Phone: (215) 564-1700

Date: October 2, 2026

*Counsel for Plaintiff R. J. Corman Railroad Company/Luzerne and Susquehanna Line, LLC*